OPINION
{¶ 1} Appellant Aaron Maurice Powell appeals his conviction and sentence entered in the Richland County Court of Common Pleas, on one count of aiding and abetting rape and one count of aiding and abetting attempted rape.
 {¶ 2} Appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 3} The Defendant-Appellant was charged with being delinquent by reason of Aiding or Abetting in Rape, in violation of R.C. 2907.02(A)(2), a first degree felony, Aiding or Abetting in Attempted Rape, in violation of R.C. 2907.02(A)(1)(c), a second degree felony, and Gross Sexual Imposition, in violation of R.C. 2907.05(A)(1), a fourth degree felony.
 {¶ 4} This incident leading to these charges took place on October 8, 2005. The Defendant-Appellant is accused, along with three (3) other juveniles of committing the above mentioned crimes against the victim, herself a juvenile.
 {¶ 5} This matter came before the Richland County Juvenile Court for Bench Trial on January 5, 2006, and January 6, 2006.
 {¶ 6} The Defendant-Appellant was adjudicated delinquent as to the offenses of Aiding or Abetting in Rape (Count I), and Aiding or Abetting in Attempted Rape (Count II). Aiding or Abetting in Gross Sexual Imposition (Count III) was dismissed for lack of proof. This verdict took place on January 6, 2006.
 {¶ 7} On February 1, 2006, the Court sentenced Appellant to be committed into the Ohio Department of Youth Services for an indeterminate period of three (3) years to age twenty-one (21) on Count I, and the same disposition was rendered in Count II, to run consecutively. However, the Court suspended the commitment on Count II.
 {¶ 8} Appellant now appeals, raising the following sole Assignment of Error for review:
 ASSIGNMENT OF ERROR {¶ 9} "I. THE TRIAL COURT VERDICT IN FINDING THE DEFENDANT APPELLANT GUILTY IN COUNT 1 OF AIDING OR ABETTING RAPE AND GUILTY OF COUNT 2 OF AIDING OR ABETTING ATTEMPTED RAPE WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE, THUS THE CONVICTION WAS IN VIOLATION OF ARTICLE 1, 10 OF THE OHIO CONSTITUTION AND THESIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION."
 I. {¶ 10} In his sole Assignment of Error, Appellant argues that his conviction was against the manifest weight of the evidence. We disagree.
 {¶ 11} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered ." State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. See also, State v. Thompkins,78 Ohio St.3d 380, 678 N.E.2d 541, 1997-Ohio-52. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175, 485 N.E.2d 717.
 {¶ 12} Appellant argues that there were inconsistencies in the testimony of Lamarius Dillon and the victim which made such testimony not credible.
 {¶ 13} In the case sub judice, Appellant was convicted of one count of Aiding or Abetting Rape in violation of R.C. § 2907.02(A)(2) and one count of Aiding or Abetting Attempted Rape in violation of R.C. §2907.02(A)(1)(C), which provide:
 {¶ 14} R.C. § 2907.02(A)(2)
 {¶ 15} (A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
 {¶ 16} R.C. § 2907.02(A)(1)(c):
 {¶ 17} "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
 {¶ 18} * * *
 {¶ 19} "(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age."
 {¶ 20} At trial, the court heard testimony from Lamarius Dillon, Appellant's co-defendant and cousin, the victim, Officer David Minnard, the officer responding to the scene and Elaine Siewert, the S.A.N.E. nurse who examined the victim.
 {¶ 21} Lamarius Dillon testified that on the evening of October 8, 2005, he, his brother, Leandre Dillon, and his friend, Charles Mack, made plans to go over to the victim's home to have sex with her. (Vol. I, T. at 22-23). After talking on the front porch with the victim for approximately an hour, Lamarius went to the Appellant's apartment, which was in the same building were the victim lived. (Vol. I, T. at 25). He testified that he talked to the Appellant inside the apartment about having sex with the victim. (Vol. I, T. at 26-27, 51).
 {¶ 22} After talking inside the apartment, Lamarius and the Appellant went back out to the front porch to join the victim, Leandre, and Charles. (Vol. I, T. at 27). Lamarius testified that the five of them sat on the porch talking and engaging in horseplay for a period of time. (Vol. I, T. at 27-28). During that time, Lamarius stated that there was talk about the victim having sex with the four boys. He testified that when that topic came up, the victim said she would not have sex with them. (Vol. I, T. at 53-54). At some point as it was starting to get dark outside, the victim ran off the porch and down the alley next to the house in a playful manner. (Vol. I, T. at 28, 69).
 {¶ 23} Lamarius testified that the Appellant chased the victim down the alley. (Vol. I, T. at 29). He said that he ran after them and saw Appellant grab the victim from behind. (Vol. I, T. at 29-30, 72-74). Lamarius stated that Appellant pulled her back into the bushes behind the house. (Vol. I, T. at 74). He followed them into the bushes, and he and Appellant removed the victim's clothing. Lamarius testified that he removed the victim's jeans, and Appellant removed her panties. (Vol. I., T. at 81). After they removed the victim's clothes, his brother, Leandre, and Charles Mack came back to the bushy area where they had taken the victim. (Vol. I, T. at 77, 110).
 {¶ 24} Lamarius testified that the four of them forced the victim to the ground. (Vol. I, T. at 80, 110). He stated that at that point, the victim did not say anything. However, when the Appellant began having sex with her, she said "stop, stop, I want to go home." (Vol. I, T. at 80, 111). Lamarius stated that he was holding the victim's arms down while the Appellant was having sex with her. (Vol. I, T. at 33-34, 60). He stated that he continued to hold her down while Charles and Leandre also had sex with her. (Vol. I, T. at 33-34, 60). Lamarius testified that he had sex with the victim after Leandre, and that he used a condom that the victim had given him after fixing her niece's radio. (Vol. I, T. at 39-40). Lamarius stated that after he was finished, Appellant had sex with the victim a second time. (Vol. I, T. at 33-35).
 {¶ 25} When questioned regarding how he could tell that Appellant was having sexual intercourse with the victim, Lamarius stated that he saw the Appellant on top of her. (Vol. I, T. at 61). He indicated that he could see what they were doing because there was light coming though the bushes. (Vol. I, T. at 62). Lamarius also testified that the Appellant had his pants pulled down. (Vol. I, T. at 62-63).
 {¶ 26} While the Appellant was having sex with the victim the second time, Lamarius stated that his brother and Charles Mack left and began walking down the street. (Vol. I, T. at 36, 93-94). He said that he started to follow them, but decided to go back and apologize to the victim. (Vol. I, T. at 36). Lamarius testified that Appellant had also stayed behind and was attempting to calm the victim down. (Vol. I, T. at 36). When he went back to apologize to the victim, Lamarius stated that she bit him on the chest and threw punches at them. (Vol. I, T. at 37-38, 92, 95).
 {¶ 27} When asked if he thought the victim consented to having sex with any of them, Lamarius indicated that from his perspective, she did not consent. (Vol. I, T. at 84). He stated that the victim didn't say anything further after telling the Appellant to stop; however, she appeared upset while the other boys were having sex with her. (Vol. I, T. at 88). Lamarius testified that she was making a noise and was trying to get away from them. (Vol. I, T. at 88). He indicated that at one point, the victim's hands got free, but he held her down again "so Charles can do her." (Vol. I, T. at 89). Lamarius testified that while his brother was having sex with the victim, she continued to struggle a little bit, moving her legs. (Vol. I, T. at 91).
 {¶ 28} When Lamarius was re-called as a witness by the trial court, he initially stated that his version of events was false, and that the Appellant had been trying to protect the victim. (Vol. II, T. at 121-123). However, under cross-examination by the prosecutor, Lamarius indicated that the version of events that he initially testified to was the truth. (Vol. II, T. at 125). When he was cross-examined by Attorney Whitney for the defense, he also stated that his version of the story was the truth. (Vol. II, T. at 126). Lamarius once again stated that Appellant was involved in trying to have sex with the victim. (Vol. II, T. at 127).
 {¶ 29} The victim testified that she was acquainted with all four of the boys who attacked her. She indicated that Appellant was her downstairs neighbor and that she had known him for approximately two months. (Vol. I, T. at 115). She also stated that she was friends with Lamarius and Leandre Dillon, who used to live down the street from her. (Vol. I, T. at 117). The victim indicated that she had known the Dillon brothers for about six years. (Vol. I, T. at 117). The victim also testified that she was acquainted with Charles Mack, who is in five of her classes at school. (Vol. I, T. at 118).
 {¶ 30} The victim further testified that when Lamarius, Leandre, and Charles rang her doorbell on the evening of October 8, 2005, she thought it was her boyfriend. (Vol. I, T. at 118-119). She stated that she sat on the porch and talked with the three boys. (Vol. I, T. at 121). She testified that during their conversation, there was some talk about sex, but she did not really respond to their statements. (Vol. I, T. at 121). After she and the boys went upstairs to try and fix her niece's radio, they went back down to the porch. (Vol. I, T. at 123). Shortly thereafter, the Appellant came outside. (Vol. I, T. at 123). The victim indicated that Appellant and Lamarius went back into his apartment for about five minutes before coming back out onto the porch. (Vol. I, T. at 124). She testified that after the Appellant joined the group, there was more talk about sex. (Vol. I, T. at 124). When asked if there came a point when Lamarius ended up with a condom, the victim testified that she had a condom sticking out of her pocket and Lamarius grabbed it while they were play-fighting. (Vol. I, T. at 127). She told him he could keep it because she didn't need it anymore. (Vol. I, T. at 127).
 {¶ 31} At some point while they were talking and horse-playing on the porch, the victim testified that she punched Lamarius in a playful way and ran off of the porch. (Vol. I, T. at 124-125). She stated that the Appellant ran after her, and Lamarius was behind him. (Vol. I, T. at 128). The victim indicated that the Appellant grabbed her in the middle of the alley and dragged her to a grassy area behind the house. (Vol. I, T. at 128-129). She testified that the Appellant did not say anything, and she thought they were still playing. (Vol. I, T. at 129-130). When asked to identify the grassy area that she was referring to, the victim indicated the area where the bushes were. (Vol. I, T. at 131).
 {¶ 32} The victim went on to testify that when they got to the grassy area, Appellant held her against the fence. (Vol. I, T. at 132). She stated that Lamarius put his hand on the back of her neck and tried to force her to perform oral sex on him. (Vol. I, T. at 132). At that point, Charles and Leandre walked back to the area where they were. (Vol. I, T. at 133). The victim stated that they got her pants down and somehow she fell to the ground. (Vol. I, T. at 133). She testified that she did not remember who took her pants off or how she got down on the ground because she blacked out. (Vol. I, T. at 133). She testified that she did not say anything when they were trying to get her pants down because she was in shock. However, at some point during the assault she told them to stop. (Vol. I, T. at 134, 146).
 {¶ 33} The victim testified that after they removed her pants and underwear, Appellant tried to have intercourse with her. (Vol. I, T. at 135). She indicated that the Appellant was on top of her trying to have intercourse for a few minutes, during which time Lamarius was holding her down. (Vol. I, T. at 136). At some point, the victim testified that Lamarius told the Appellant to let Charles have a turn. (Vol. I, T. at 137). She stated that Charles said it wasn't right and that's when Leandre tried. Id. After Leandre was done, the Appellant tried a second time to have sex with her. (Vol. I, T. at 137-138).
 {¶ 34} The victim testified that throughout the whole incident, Lamarius was holding her down, but she got free at some point while the Appellant was on top of her. (Vol. I, T. at 138-139). She stated that she did not have time to get up before Leandre, Charles, and Lamarius grabbed her arms again. (Vol. I, T. at 139). At that point, the victim testified that she started crying so Charles and Leandre left. (Vol. I, T. at 139). She further testified that after Appellant was done having sex with her the second time, Lamarius tried to have sex with her but she was able to push him off because her hands were free. (Vol. I, T. at 139).
 {¶ 35} The victim testified that after she got away, she put her pants on, crawled into the corner and cried. (Vol. I, T. at 139). When she got up, Appellant hugged her and told her it was going to be all right before he left. (Vol. I, T. at 139). The victim then went home where she lay on her bed until her mother came in to ask what was wrong. (Vol. I, T. at 140). She then locked herself in the bathroom and took a shower. (Vol. I, T. at 140). After her shower, the victim testified that she took her dog outside and walked to her niece's house next door to get her niece some clothes. (Vol. I, T. at 142). As she was walking next door, her neighbor Robin pulled up and she told her what had happened. (Vol. I, T. at 142). The police were called, and the victim was taken to the hospital for a sexual assault examination. (Vol. I, T. at 146-147).
 {¶ 36} At trial, the victim was unable to say if any of the boys had penetrated her during the sexual assault. She testified several times that she did not feel any penetration, and that she did not know if penetration was made. (Vol. I, T. at 137, 141, Vol. II at T. 19-20, 21-22). However, Elaine Siewert, the S.A.N.E. nurse who examined the victim, testified that she observed "a lot of redness from the area of four o'clock till the eight o'clock on the posterior fourchete." (Vol. II, T. at 32). She testified that the posterior fourchete is the bottom part of the genitalia inside the outer vaginal lips. (Vol. II, T. at 32-33, 51). Nurse Siewert stated that the redness that the victim sustained in the posterior fourchete is an indication that some blunt object went through the labia majora. (Vol. II, T. at 50). She further stated that in her professional opinion, based upon her training, there was some type of friction that area to be so red. (Vol. II, T. at 51). In response to the trial court's question as to whether the injury could have been caused by outward force without penetration, Nurse Siewert testified that according to her training in the State of Ohio, anything that passes the labia majora is penetration. Based upon her training, she concluded that penetration occurred in this case. (Vol. II, T. at 51-52).
 {¶ 37} Appellant argues that the victim's testimony is not credible because she told the S.A.N.E. nurse that she had been raped by three boys, but at trial she testified that there had been four. (Vol. I, T. at 148, Vol. II, T. at 16).
 {¶ 38} When questioned about this discrepancy at trial, the victim testified that she initially said three because the fourth person lived right underneath her and she did not want neighbor problems. (Vol. I, T. at 148). She also indicated that at the time she gave the statement to the S.A.N.E. nurse, she was not thinking straight. (Vol. I, T. at 148).
 {¶ 39} In explaining its verdict, the trial court stated:
 {¶ 40} "I find it uh difficult in the totality of the circumstances or at least in my thinking working through it, that Aaron was there merely to protect when we had some corroboration uh from the victim and, alleged victim, and Lamarius Dillon that, in fact, let's put it this way. There was uh much consistency between the testimony of the victim and Lamarius Dillon for most of these events. And, uh even though it's very clear that Lamarius Dillon at the end, particularly at the end of this case, uh was taking it both ways. And the Court had to sort out what all that meant. And I see that he is caught in a very tough spot uh of testifying against his cousin, and what all that means. Now, uh the Court actually told him, though my own inquiry, uh what Aaron Powell had claimed. In other words, I said defendant claims that he was just there to protect her, he didn't do this. And when I asked, well, whose story is right, and he said Aaron's story is right. Then he recanted on his own. Then at the very end he came back." (Vol. II, T. at 141-142).
 {¶ 41} The trial court found that the Appellant was guilty of aiding and abetting rape and aiding and abetting attempted rape. (Vol. II, T. at 142-143).
 {¶ 42} In support of its guilty finding on aiding and abetting rape, the trial court noted that it found that Appellant was an aider and abettor in the sexual assault, and that "at least one-of these boys all acting in concert, uh penetrated her to a sufficient degree to constitute sexual conduct under the statute." (Vol. II, T. at 143). In support of its verdict of guilty as to the charge of aiding and abetting attempted rape, the trial court noted that there was evidence that the Appellant was on top of the victim at least twice.
 {¶ 43} The trial court stated:
 {¶ 44} "I find it uh especially incredulous that Aaron was on top of her uh and at first he says on top of her, and then he tried to give some explanation that he was around her to uh, to sort of fend them off and to protect her. I, we didn't get any of that from Lamarius. I didn't get any of that from the uh from the victim in this case, and I just find that in the totality of the evidence here, that is simply just not, it is simply not credible with the Court." (Vol. II, T. at 143-144).
 {¶ 45} Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, syllabus 1.
 {¶ 46} The trial court was free to accept or reject any or all of the witnesses' testimony and assess the witnesses' credibility. Based upon the facts noted supra, we find there was sufficient, competent evidence to support appellant's conviction, and the same was not against the manifest weight or sufficiency of the evidence.
 {¶ 47} Appellant's sole assignment of error is overruled.
 {¶ 48} For the reasons stated in the foregoing opinion, the judgment of the Richland County Court of Common Pleas is hereby affirmed.
By: Boggins, J.
Hoffman, P. J., and Edwards, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Juvenile Division, Richland County, Ohio, is affirmed.
Costs to appellant.